Consolidated Cases of Zille Shah and Mohamed Nawaz v. Alex M. Azar. Let me hear first from Mr. Lippe. It plays to court. Good morning. I represent Dr. Nawaz, a board-certified cardiologist specializing in geriatric care, and his wife, Dr. Shah, who is a family practitioner practicing geriatric care. The issues presented by these appeals, although very similar and closely parallel, focus upon the propriety of the interpretations applied by CMS on the various regulations. Can I ask you a question? I saw that they were banned for three years from re-enrolling. Correct. That expired, as I see it, last fall, 2017. Have they re-enrolled or sought re-enrollment? They are in the process of seeking re-enrollment. It's far from moot because they have lost very substantial billings during the three-year time period. So you're claiming damages, not just reversal of the order? Well, we can't claim damages. That's what I thought. There's no sovereign immunity. But we are seeking cancellation and revocation of the denial of their privileges, reinstatement of their privileges back to the date of revocation. And there will be damages sought, very substantial damages. What's the mechanism for doing that? I'm just not familiar with this area. I'm not familiar either, frankly, Your Honor. It would be a matter of applying for past due billings through the CMS process. But it's like a lawyer who's been disciplined in this district, and he goes and applies in a different district. Every time you apply as a doctor for privileges at a hospital, every time you apply for malpractice insurance, you're going to have to answer the question, have you ever been denied, have you ever been revoked? This is an ongoing stain on their records that, unless undone, will remain. Initially, there's a question of the standard of review, the Administrative Procedure Act versus the Medicare Act. The significance of that is that the APA standard allows consideration of whether the action was arbitrary and capricious and abusive. Did they really control the outcome of this case? Did it really make a difference, these two standards? They sort of collapse into quite similar inquiries, don't they? The argument about applying the 1395 standard says that all you look at is substantial evidence, and that forecloses the analysis. We are claiming, for example, that the penalty was vastly disproportionate to the alleged wrongdoing, therefore arbitrary and capricious. We are claiming that the agency failed to apply the law, failed to analyze the law correctly, and I don't believe that that would be allowed under the standard of review of just looking at substantial evidence. So I believe it is significant. We've got the case law and the analysis that we believe substantiate application of the APA standard. What happened here was that there were three three-day trips where the doctors were out of the country. During that time period, billings were submitted. Frankly, the whole process before CMS appears to have been that, well, you were out of the country, therefore you couldn't bill. End of discussion. And the analysis, if you look at the ALJ's decision, if you look at the Department of Appeals Board decision, stops right there. That assumes that the requirement under law is that there be physical, personal presence of the billing practitioner in the country. Personal presence. If the number of that physician were being used, the billing number or whatever it's called. Right. The billing number of that physician was utilized. We believe that this requires analysis of 410.26 of 42 CFR, and the evidence presented at the CMS level, which has been brought forward as part of the record, shows that there's been a lot of confusion over how do you apply this standard. It's called the incident to billing standard. Dr. Lamar Blunt, a well-renowned expert, gave his opinion where he discussed this process about how CMS was changing its various interpretations of that regulation. Well, what does the regulation deal with? That's really critical because it allows for under 410.26, it considers the fact that billing can be done by auxiliary personnel, meaning someone other than the billing provider, auxiliary personnel acting under the supervision of a physician or other practitioner throughout the regulations, throughout the statute. It allows for making arrangements with another practitioner to act on your behalf. The standard that was applied... If you don't understand it, they said that they did ask a cardiologist to cover for them, so to speak, but I didn't understand that there was a physician present when the nurse practitioners or whatever were providing the services for which the government was billed. That is the critical issue as to who's supposed to be present. 410.26b-5 starts off talking about in general services and supplies must be furnished under direct supervision, but if you read the next sentence, services furnished incident to, skipping a couple of words, chronic care management services can be furnished under general supervision of the physician when the services or supplies are provided by clinical staff. General supervision. Help me a little bit here. What I read there, as I recall, is that they define what they mean by a physician present, explicitly saying that he or she, the doctor, need not be in the examining room while the service is rendered, but he has to be virtually within the shop, so to speak, where he's immediately available. That is part of what they say. However, if you look at the general supervision section, which deals with chronic care management, and keep in mind we're talking about treating patients in nursing facilities, geriatric care. This is not acute. I mean a cardiologist, acute means heart attack. Chronic means ongoing treatment of it. This 410.26 refers to 410.32. 410.32 under levels of supervision, and this is the handout that I furnished to the court, because it focuses upon the three different levels of supervision. There's general supervision, direct supervision, and personal supervision. The standard of law that's been applied below has been to require direct supervision, meaning the physician present in the office suite and immediately available. But here, since we're talking about chronic care management, it means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required. However, under general supervision, the training remains the continuing responsibility. So if you look at the evidence submitted by Dr. Shaw in her affidavit as part of the record, she explains, I was involved in the patient care before and after my trip and also arranged coverage by three physicians, and names them. If the need for a physician arose while I was out of the country, the medical directors of each facility agreed to cover for me. The necessity for a physician to be present while I was out of the country did not occur. Well, that is her explanation, which I think, if you analyze the definition of general supervision, means that she was in compliance. Dr. Nawaz testified in his affidavit that he has phone records showing his ongoing involvement, that he had two cardiologists, and he names those covering for me on the above dates, as well as the medical director in each facility. So now what we come back to is the whipsaw effect between applying the summary judgment standard and examining the details of the affidavits. There was a request made for an oral hearing. There were objections made to the general conclusory affidavit, which was the only evidence presented by CMS, by the contractor Novitas, who summarized what he had seen in medical records. Obviously hearsay, obviously biased because he's employed by a company that's going to get a percentage of monies that they recover for CMS. How does this explain the use of the physicians who are not physically present, who are away? They're their billing number. I thought there was another provision that provided for a reduction in the compensation to 80%. There was a regulatory response to the absence of a physician by reducing the amount of reimbursed compensation from full compensation to 80%, as I recall it. It's 85%. 85%. And the ‑‑ Please speak up. How does that work? It seems that the prevailing standard now, with all this uproar, is to focus on and utilize the nurse practitioner's billing number, provider number, and that is probably, under today's standard, the correct way to do it. I'm submitting that back in 2011 and 2012, when this investigation was ongoing, there was the confusion. And based upon the reading of the regulations and the evidence that was submitted ‑‑ But basically you're arguing that while, as now presently clarified, these physicians may have been in violation at the time that they were away, the regulations were not so clear. I don't believe that they were in violation because of the fact that this was chronic care. Were not so clear or, in fact, were not in violation of the rules. We don't believe it was in violation because ‑‑ But they would be in violation of the rules as now stated? No. It would just be better practice because of what the reactions have demonstrated from CMS. I don't believe that ongoing chronic care management requires, under the definition and the regulation, anything other than general supervision. Okay. And that's done where I see the patient, I develop their care, I educate the nurse practitioners, I supervise what they do, I tell them what to do, and then I'm out of the country for a few days, but they're doing what I've told them to do. I'll take an example. Ongoing chronic care, let's take a cardiac patient. They're going in every three or four months and having some kind of a test, examination, routine examinations, and so forth, blood work, as well as some exercise performance. The physician is not there, not even physically present, down the hall, whatever, is the nurse practitioner. Now, that, I think, is a fairly standard practice, but that's because it is chronic care of chronic care. Now, when they were out of the country, were these patients that were being seen by the nurse practitioner, put aside the use of the billing number for a moment, was that, is it disputed that that was chronic care, or was it something more? I'm not aware of any dispute or any claim that it was anything other than chronic care. The evidence presenting below was that these were ongoing patients who had been seen by the doctors. Okay, now, that doesn't answer to me the question of why the physician's billing number was used. The billing number means it triggers a different rate of compensation, because it implies that the doctor is actually providing a service, and they were not. They were away. So how do you respond to that? Why wasn't it in violation for them to use the billing number, the physician's billing number? Under general supervision by a nurse practitioner, whose billing number is used? I assume it's the nurse practitioner's. The last sentence of 1426B-5 says, however, only the supervising physician or other practitioner may bill Medicare for incident-free services. Only the supervising physician. Well, if I'm providing general supervision, and these are my nurse practitioners, I'm the supervising physician. That's right in the regulation. We quoted it, page 26 of the brief. So I believe that it was proper. Now, if you assume that there was a mistake, I'm not agreeing that there was, not admitting that there was, what was the harm? The harm for Dr. Shaw has been calculated based on the evidence that the differential between 100% and 85% was $900. The differential for Dr. Nawaz was about $1,500. So because of those relatively minuscule violations, if they're violations, what was done? Well, Dr. Nawaz was prosecuted for criminal violations, which were ultimately dismissed. He had to repay $300,000 to Medicare, and he lost over half a million dollars in billings after that. Dr. Shaw lost her practice for three years, and now they have this ongoing state. That is totally disproportionate to the alleged damages that they allegedly did. There needs to be clarification as to when it's proper for CMS to deny a hearing and grant summary judgment where you've got challenged evidence on the one side and evidence that utilizes terms of art, medical terms of art, a covering physician. When you started, you said CMS based it entirely on them being out of the country, which is how I read it too, and that's an undisputed fact that they're out of the country. So I don't see why it was improper to do it as summary judgment. District courts can do that when the jury's the ultimate decision maker. So it seems to me the harm's a lot less when the ALJ, who's the ultimate decision maker, is saying I can do this in a summary manner. Well, here's the problem. If you're going to say that I had someone covering for me isn't adequate, well, if there's a hearing, if there's a witness on the stand, you say, well, what do you mean? And there would be an objection. If I think that the other side is offering conclusory testimony, I object, and the ALJ or the judge will rule on that objection. Here there were no objections to that evidence. It was a term of art. But to take the undisputed fact that they were out of the country, not physically present, and their billing numbers were used. Correct. The constant, the legality of that, it seems to me, it offers questions of law for some to be determined. In other words, I don't understand that there's any more conduct, and that's an issue, or what their positions are, as to have done improperly what was undisputed, and whether that's improper or not is a different question, but that's a legal question, isn't it? Mr. Lipp, you all asked to consolidate the cases for argument, and you asked for additional time, and I denied it because I thought the cases were identical. I'm going to correct that. You've gone over about five minutes. We'll give you five, ten minutes more, and then some time on rebuttal, and the other side will have 30 minutes. I apologize. I should have recognized the complexity. It was greater than I thought. We're at the disposal of the court, obviously, so thank you, Your Honor. Well, some way or another, we have only two cases to argue this morning. However, we do have other work. We don't want to take up the rest of the morning, but I think I should give you some more time if my colleagues will agree. Thank you, Your Honor, and, Your Honor, to address your point, I want to be sure that I'm answering you directly. Yes, it's a question of law. Unless there's a question about, well, I had physicians covering for me, unless that's deemed to be something that the fact finder doesn't understand. Our argument is that- I don't understand covering for me means that a cardiologist, an interventionist cardiologist is there if you have an event, an episode, but I don't understand covering to be any kind of supervision or provision for the services that the nurse practitioner was doing. I think the real question comes down to what level of supervision was appropriate, and under 410.32, we believe that the evidence, as a matter of law, properly considered by the fact finder shows that both of these physicians, they had seen all the patients themselves personally. They had determined a course of care. They had instructed the nurse practitioners as to what this course of care was. They had written orders, and the nurse practitioners were instructed to continue that process. Now, yes, they're ultimately responsible for what those nurse practitioners do, as the regulation provides. But whose billing number is used for that? The billing at question was utilizing the physicians. I know that's what they did, but I don't understand how you could- You're saying general supervision. That's pretty abstract, general supervision if you're out of the country. That's what's confusing me. I read this, the billing number was required for a physician to use his own billing number. He or she had to be there. Well, I understand the court's concern, and I simply have to go back to- Okay, we've been over that. The statute which says only the supervising physician may bill Medicare for incident to services. These are incident to services. I'm the cardiologist. I'm saying what needs to be done, and the services that are incident to my practice are what's being done by the nurse practitioners under my supervision. Now, the corrective action program. Totally ignored. The Medicare statute recognizes that there should be a procedure for implementing a corrective action program to undo a revocation if you show that you've implemented procedures to prevent this from occurring. Novitas' response to the corrective action programs, which in both instances was I have stopped using nurse practitioners, I've changed billing companies, and I'm relying on the advice of an attorney now. Novitas said, well, you haven't proved that you were in compliance. Well, corrective action program means I'm going to fix things so in the future there's not a problem. And so they say, well, you haven't proved that you didn't have a problem. But just totally arbitrarily ignoring what the whole definition of a corrective action program was. Now, we were denied the ability to have that considered by the DAB because they said that the refusal to agree to acknowledge a CAP is not an initial decision and therefore something that we don't have authority to consider. I think it's nonsensical for the statute to recognize there should be the possibility of a correction, a corrective action program for the other regulations of CMS. It's discretionary, though, right? The regulation says may. Correct. And they were given by Novitas a deadline to submit a CAP, and they did meet it by that deadline. But then it was just tossed in the trash can. So that was an arbitrary and capricious act, we believe. We believe that CMS should allow for consideration on the merits as to whether or not the CAP does anything, whether it corrects the problem or not. But they didn't even get that far. They just said, well, there was a problem, and it didn't go any further than that. So confusion in the statute, chronic care being furnished under general supervision, there was evidence to establish that there was proper general supervision in this case, billing for time periods when these practitioners were out of the country, but we believe in compliance with the regulation, and then the imposition of penalties that were just vastly disproportionate to the alleged wrongdoing. We greatly appreciate the Court's time and indulgence of the extra time here. If there are any other questions, obviously, we're available.  Thank you. Thank you, sir. You have some time on rebuttal. Mr. Vysotsky? Mr. Vysotsky? No venue problem this time? Busy week. I believe that these were Sherman doctors, and we were responding to the case. We didn't bring this case. Definitely ensconced in the Eastern District. Good morning, Your Honors. Counsel, may it please the Court. I'd like to start with, I have to be honest, I'm kind of confounded by the argument that I just heard, and I was handed this piece of paper this morning by counsel for Regulation 41032 with the term general supervision highlighted. Neither doctor has, through the entirety of this case, at the administrative level, at the district court, or in their briefs on appeal, ever argued this chronic care argument and that somehow the level of general supervision was required. In their brief on appeal at page 26, and this is from Dr. Noir's brief, Dr. Noir says, for purposes of this section, the following definitions apply and relies to and cites the Incident 2 Billing Statute, 41026B5, and highlights the part where it says, in general, services must be furnished under the direct supervision of the physician, and then goes on to cite the regulation in this handout that I received this morning, 41032B32, and on page 27 highlights the term direct supervision. And in addition to that, counsel is relying on the current version of the regulation. And from the time of the administrative case, the Departmental Appeals Board called him on that and said, look, you're relying on the current version of the regulation. What applies is the version of the regulation that applied at the time of the conduct. Under the current regulation, would there be a violation? Yes, yes. I don't know about this chronic care argument because it's never been raised. I haven't looked into that. All I know, Your Honor, is that at the time of the conduct, this is Regulation 42 CFR 41026B5, and this is the incident to billing regulations. Well, let me just stop you for a moment. Tell me in plain language what the doctors did wrong and what they violated before you start reading all the, throwing all these regulations out. You can't follow that. Well, in the simplest terms, Your Honor, their privileges were revoked. I hope they're in simple terms because the consequences of violating these regulations were huge. Well, I don't know how, Your Honor, it can be even clearer. Do you want to tell me what it is then? Well, what it says is it gives the CMS various grounds for revocation. One of them is abuse of billing privileges, and it defines abuse of billing privileges. It describes this very scenario if a doctor bills for services that could not have been provided at the time the services were performed. And it goes even further. It says an example of this is if the doctor bills for services when the doctor was out of the country, and that's exactly it. The doctor using his billing number means that that doctor performed those services. But these were, of course, incident to doctors' services. In other words, you have a doctor bills for compensation for the people who assist him and his office itself, as I understand it, under these regulations. Well, they billed under their own physician numbers for the dates that are agreed upon. There's no question about that. So what they billed for were services provided by themselves at the 100% rate. Those services could not have been provided because they were out of the country. Well, I guess I don't follow all of this convoluted tracing through the regulations. If the regulations clearly say that you can't bill, if that billing number means when you submit that bill that you, the physician, provided those services. But I thought that what they were doing was billing for services that were incident to a nurse practitioner. Now, the government, you say, is misled because the doctor wasn't providing any services, and yet he was being compensated for it. Is that it? Well, Your Honor, the whole purpose of these incident to billing provisions is that a doctor can bill under his own physician number even if he's not performing the services. Right. So long as they're done under the direct supervision of that physician. That means he has to be, and it's very clear, it's hard to misunderstand. Direct supervision rather than general supervision. Correct. Okay. And it's impossible to misunderstand the regulations definition of direct supervision. It says you must be present at the facility. You don't have to be in the same room, but you have to be present at the facility and able to help out if something arises. That did not happen here. Well, I understand that if that's the position, then you need not go further. In other words, they were out of the country. They couldn't have been present. They used a billing number. You can't do that, period. That's correct, Your Honor. They do make a separate argument, and that's another concern in this case. They make contradictory assertions of fact, and they have from the beginning. On the one hand, they say we made a mistake. We shouldn't have used our own billing numbers. We should have used the billing numbers of the nurse practitioners who provide the services. They told CMS, oh, we were young doctors. We didn't know. We blame the billing company. And Mr. Lippe mentioned an expert affidavit that they provide at the administrative level. I don't believe that that was considered because the ALJ rejected it because of some procedural reason that isn't complained about. But in any event, that own physician in his affidavit said, and it's at the Shaw record of page 914, that the billing service should have billed the nurse practitioner services under their own provider number. But Dr. Shaw was unaware of this billing service mistake at the time. On the other hand. Well, let me clarify this. Shift back and forth. You're talking about a false billing for services the physician did not perform, but the actual services that are issued are staff that work. And basically the doctor cannot bill for those unless he has direct supervision. The doctor admittedly was not there. And the doctor wouldn't in his office be doing them himself. Well, I don't think there's any dispute that services were performed by nurse practitioners. But what these doctors billed for were services provided by themselves at the 100% versus the 85% rate. So it's a 15% differential that you were overcharged. That's correct. And there's no exception to that for treating chronic conditions. I thought I heard some argument to that effect. Not that I'm aware of, Your Honor. Of course, I've never evaluated it because I just heard that argument today for the first time. So I haven't looked into that. Well, what we're giving is a section 41032, et cetera, and it talks about levels of supervision. And what you've been describing is direct supervision. But then it turns out there's another level of supervision called general supervision where the physician's presence is not required. And so I assume that there's been some determination that the services were billed for required direct supervision rather than general supervision. I think that's absolutely correct, Your Honor. I think there was just an understanding of the parties, the ALJ, the DAB. But that depends on what the services that are provided were, how the patient was being treated or not treated and by whom. And that triggers whether it's general supervision or direct supervision. And where do we learn that the billings that they submitted for were of the type that required direct supervision, which you've maintained, versus general supervision? Because that's what was always at issue in the case, Your Honor. The issue, as always framed, was it was just assumed that because their argument was they billed under incident to— It all comes down to the use of their billing number. They should have billed this, and what should they have done? What they should have done is billed under the nurse practitioner's number. Okay. But— Well, this whole regulation that has this level of supervision, it's about 410-32, diagnostic X-ray test, diagnostic lab test, and other diagnostic tests. Is that what was being billed when they were out of the country? Or was it—it looks like this is all just about X-rays and lab tests. We don't know what was being billed. I just don't know, and I can't even say because it was never presented as an issue, so I've never looked into it. So on the one hand, they're arguing it was a mistake, and their own expert says they should have billed under the nurse practitioner's number. Yet on the other hand, their argument is, well, we did everything perfectly because we had covering physicians. And under Incident 2 billing, you can still bill for the 100% rate if you have a physician. But the physician—and it doesn't have to be the physician supervising the patients more broadly. It can be under another physician, but they have to provide direct supervision, meaning they have to be at the facility and available to help out if necessary. So— Well, they said they had covering physicians. Well, they say that, and they ask to that issue in their brief, and this is Dr. Shah's at page 21. The real question is just how much detail need be specified to explain what a covering physician is and what he or she is ready, willing, and able—ready, willing, and capable of doing in order to provide the supervision required under the regulation. And I would submit that it's extremely easy to do that because you just provide a declaration or an affidavit from the covering physician saying, I was sitting there at these nursing homes, at the hospital, wherever it was that Dr. Nawaz provided the services. I was there. I was sitting in some room while these nurse practitioners were providing the services. That never happened. All they did is provide some vague statement that, oh, we had covering physicians to help out if an emergency— Why wouldn't that doctor bill his or her billing number? Well, that's a good point, Your Honor, and I think it deserves clarification from the opening argument. If there were an actual covering physician there, just assume that there was, that physician under the regulations, that physician should have billed under their own billing number, not Dr. Shah's. And that's made clear by the own version of the regulation that the appellant cites here. And it says the physician or other practitioner supervising the auxiliary personnel need not be the same physician who is treating the patient more broadly. However, only the supervising physician, meaning the physician there doing the supervision, may bill Medicare for Incident 2 services. So even if they were correct, they still would have billed under the wrong billing number. It seems to me I'm looking at these different regulations. I mean, they were—in the ALJ and the district court said 426.10b applies, which is for services and supplies, and that says that must be furnished under the direct supervision of the physician. That's correct. And then now we're presented with 410.32, which is for diagnostic X-ray tests, lab tests, and other diagnostic tests. I mean, it seems that's the difference. There's one regulation for these tests. There's one for services. And they were—I mean, I don't know. It seems like we don't know what they were, but, I mean, the case was litigated up to this point under the regulation for services and supplies that have to be furnished under direct supervision. I'm sorry, Your Honor. There's an explanation for it, and I misunderstood your question earlier. And the reference to the 410.32 is just a cross-reference from the Incident 2 billing regulation. So it's start out 410.26b-5, and it says to bill for Incident 2 services, the services must be under the direct supervision of the physician. And that same regulation, subsection A-2, defines direct supervision, and it says it means the level of supervision by the physician or other practitioner of auxiliary personnel as defined in 410.32b-3-2. So I think that's just a cross-reference. Right, but one point is it doesn't—general supervision is in 1. It's not cross-referencing the general supervision. Right, right. So the general—and this, if you look at the whole thing, it says general supervision applies to these lab tests. I mean, he highlighted the general supervision instead of direct supervision. Yeah, I don't understand. But is there anything that says general supervision applies to the services that were billed for here? Nothing on the order. As far as the—well, one case I'd like to point out, Your Honors, that really deals with this directly, and we cite to it in the brief at the district court. It's a district of New Jersey, Landau v. Lucastie, and— What's the name? Landau v. Lucastie. It's 680F2D659. And there, the defendant in that case made the same argument that the doctors are here, and they're saying that the flaw is that the patients did not bill Medicare for the services incident to the services of the nurses, but instead the vast majority of claims identified the doctor himself as the provider using the billing code for physician services. And that case explains that the regulations unambiguously require, if you're going to bill for incident to billing services at the full physician rate, that the regulations are unambiguous that the doctor must be present and available to help out. Appellant's counsel mentioned criminal violations. Our office did have a criminal case at one point, and appellant's counsel described the case as being dismissed. There was a pretrial diversion agreement in that case in which Dr. Nawaz agreed to pay $300,000. And in this case, you can just compare that with the argument in this case saying, oh, the difference, their argument is the 15%, you know, the billing was really minuscule. There had to have been a lot more going on here for Dr. Nawaz to agree to pay $300,000, in addition to $100,000 that was seized in the case. As far as the corrective action plan issue, I mean, I think, again, here the regulations aren't clear. They allow suppliers or providers to provide a corrective action plan, but there's certainly no guarantee that CMS will accept it. It's like in a criminal case, if a defendant robs a bank and submits a plea offer that he agrees not to rob any banks in the future, just set me free. Well, that's well and good, and it might be considered, but that doesn't mean that we overlook the wrongdoing, and the regulation expressly provides for that. And just one clarification for the court. I tried to be careful in citing the regulations that were at issue at the time for the corrective action plan. I did not. So I just went on Westlaw and did the versions at the time. So from July 16, 2012 to February 2, 2015, the regulation at issue for corrective action plans 42 CFR 405-809, it has no effect substantively. I just point this out for the court. But if a provider or supplier completes a corrective plan and provides sufficient evidence to the CMS contractor that it has complied fully with Medicare requirements, the CMS contractor may reinstate, and it goes on to say, a CMS contractor's refusal to reinstate a supplier's billing privileges based on a corrective action plan is not an initial determination. And an initial determination is basically what provides the path to judicial review. So there's no jurisdiction to review CMS's rejection of the corrective action plan. And I'd also like to point out that that regulation says if the provider provides sufficient evidence to the CMS contractor that it has complied fully with Medicare requirements. Of course, they could not do that because they did not comply with Medicare requirements. In terms of the penalty, I already addressed the pretrial diversion agreement and some circumstances behind the criminal case. The regulations, I'm sorry, I understand it's technical, but it's a technical area. 424-535-C gives the agency discretion to impose a re-enrollment bar. The band is not that wide. It must be a minimum of one year, but not greater than three years, depending on the severity of the basis for the revocation. CMS looked at the conduct here, the fact that numerous, numerous claims were provided, anywhere from 60 to over 100 for each doctor, and determined that the three-year bar should apply. And as we point out in the brief in this court's ESCBAR case, talking about administrative penalties, this court looks at really three factors. Is it warranted in law? And it clearly was. The regulation gives the agency discretion to impose a one- to three-year re-enrollment bar. Is it supported in fact? Clearly it was. There's no dispute that these doctors were out of the country at the time these services were billed for under the physician's provider number. So that's the physicians that simply used the billing number of the nurse practitioner. What result? There would be no case. So the most direct way to state this is simply that this case boils down to the fact that the doctors used their own billing number rather than a nurse practitioner, and they could not do that under these regulations. Is that it? Well, in simplest terms, you look at the revocation regulation and the fact that they billed for services that could not have been provided because they were outside of the country. And they did provide for – so the second layer to that is, well, services were provided, but they weren't the services that were billed for because they billed for the 100 percent rate, whereas the services that were provided were by nurse practitioners, which should have been billed for 85 percent. And I understand that in Appellant's argument that the damages and the amounts of money here are relatively small considering, but I think what the program looks at is that Medicare is an immense program that has an important function. And they might be small here, but if you allow this conduct to continue throughout the country, it generates a lot of fraud, waste, and abuse in the Medicare system. And the purpose here – Well, we always see these criminal cases where there's $50 million in Medicare fraud, and everyone always says, well, why didn't Medicare stop this before it got to that point? That's correct, Your Honor. And I'll be honest, when I first received this case and looked at it, I thought, you know, based on the conduct, maybe it's not my call, but maybe the penalty was a little severe. But having lived with it now and given the volume of claims that were submitted, the type of conduct, it's pretty flagrant conduct being out of the country and billing for services under your own position. And also just that they've continued throughout this entire process to assert two contrary theories, not legal theories, but assertions of fact. They cannot be trusted. They're asserting on one hand, we fully complied, we did everything perfectly, we had covering positions, even though they provide no evidence of that. They just said vaguely we arranged for covering positions. Yet on the other hand, they admit and they submitted sworn testimony to CMS that they made mistakes. They cannot be trusted. And for those reasons, Your Honor, we would submit that this court affirmed the judgment of this court and the judgment of the DAB. Thank you. Thank you, sir. Mr. Lipp, can you tell us what you need to tell us on the bottle in ten minutes, eight minutes? Yes, I definitely believe so. We have maintained throughout the appeal that if you look at the statement of the issues, that the question is at page two of the appellant's brief whether CMS properly construed and applied 42 CFR 410.26B5 in light of the incident to billing rule. That's been at the heart of the appeal. The claim below was by CMS and by the ALJ that you had to have direct supervision. Now that I've had a chance to look at this regulation, were the services in dispute here for x-rays and blood tests? I mean, there it makes sense. This is what the regulation says. You just need general supervision. The doctor doesn't need to be there because to do a blood test, why does the doctor really need to be there? It makes more sense if you're performing medical procedures or examinations, the doctor should be there, and that's direct supervision, and that's how I see the regulation dividing up. What were the services here that were billed for? Well, it is true that 410.32 does deal with diagnostic x-ray tests and laboratory tests. That's true. The reason why we're referring to 32 is that it's referenced by 410.26B. That's the only, this is the only definition. Part I is? Part I is? 3I? Three, two, three two small I's is referenced. Right, which is the direct supervision. Which is direct supervision. So how do you get to general supervision, which is what you need? That's what you highlighted for us. I went to 410.32 because it had been utilized. Just for direct supervision. Correct. If we ignore 410.32, let's forget about it for a second. Look at the language of 410.26B.5. In general, services and supplies must be furnished under the direct supervision of the physician or other practitioner. It means someone else can do it. But then the next sentence in B.5 says services furnished incident to chronic care management services can be furnished under general supervision. Chronic care management services, that's not limited to x-ray tests. It is true, as you're pointing out, that 410.32 deals with those limited tests. That's the only reason why I've referenced it, was that this is the only definition of general supervision I could find. Why did your client raise any of these points or support any of their assertions by affidavit? I'm sorry, I didn't know. The clients did say that they provided, if you look at the detail, they explained that I saw Dr. Nawaz's affidavit at page 1170 of the record. It says I hired a nurse practitioner. I would spend two to four weeks with them, that I saw each of these patients myself, that I told each of these nurse practitioners what the standard of care was going to be for each and all of these patients, and that on the dates when I was out of the country, I had two cardiologists covering for me in dispute. So, yes, I think that Dr. Nawaz explained that. Dr. Shaw, in her affidavit, said that. That doesn't give them the basis for billing for their own, using their own billing number. I haven't heard any justification for that. Well, using their own billing number, I go back to only the supervision, under the last sentence of subparagraph 5, only the supervising physician may bill Medicare. So if they're satisfying the general supervision requirement of B-5, then it's okay for them to use theirs. However, Dr. Blunt had explained in his analysis of the industry, is that there was a lot of confusion as to how this is going to be applied. I think that there is justification under the very language of this regulation. I'm the physician. I've assessed the patient. I've determined their standard of care. This is chronic care management services, as stated in B-5, and it's under my general supervision. The only reference that I could find in the statute to what general supervision means is in 410.32, which admittedly, by its terms, covers just a subset. If we don't have reference to 410.32, then what does general supervision mean? Well, our evidence shows that they saw the patients, they advised the nurse practitioners, they told them what to do, and that they remained responsible. I believe that that should be sufficient. If it's not sufficient, then we get to the question of the enormity of the penalty that was imposed. What was the amount of the dollars that they were compensated for? Right. Just give me some sense of the amount of money that they billed for while they were out of the country. I don't have that number off the top of my head. It's referenced in the difference between 85 percent and 15 percent. I understand that. My impression was it was a large sum of money. Well, the $300,000 that Dr. Nawaz had to repay was all of his billings, everything that Medicare had paid him for all services for a certain period of time. It wasn't just for the billings in question here. I understand that. I was just trying to get a sense of they were out of the country for that period of time, and they used their own billing number. It seems pretty clear that that shouldn't have been done. My question is that I'm going to your other point. Assuming that that's correct, that that was a mistake, then my question is how much does that overbilling amount to in dollars? Well, 15 percent was $1,600. My math on this is tough, but 15 percent is a little bit more than – 100 percent would be a little more than six times, so that means that the total would have been in excess of $10,000. It would have been in the $10,000 range. Six times 900 is $5,400. So my – without the access to a calculator. Okay, well, that answers me. I just wanted a sense of the range of it. The council's constant reference to the out-of-the-country. You can't bill when you're out of the country. If you look at that statute, which is .35, I believe it's referenced, the statute says it's an abuse of billing if you bill for services that were not rendered. Examples are – so the actual language of the regulation gives examples, and another example is when the patient is dead. There have been fraudulent cases where people bill for dealing with ingrown toenails for amputees and deceased people, and that's not applicable here. The – there was no evidence from the covering physicians, but there was evidence that there were covering physicians. So I don't know how much evidence – Were their names listed in the affidavit? Yes. Both doctors gave it. But they didn't provide a name. Right. Yeah, they gave the names of the covering physicians, and the fact that CMS has discretion to do a re-enrollment bar of one to three years still means that they have to apply that with some sensibility. So – Okay, Mr. Libgate, thank you for your argument. Thank you. We'll take this case under advisement.